COAL SALES AGREEMENT

This Coal Sales Agreement (the "Agreement") is made and entered into on May 1, 2016, by and between Bluestone Energy Sales Corporation ("Seller"), 302 S. Jefferson Street, Roanoke, Virginia 24011 and Monongahela Power Company ("Buyer"), an Ohio Corporation. Seller and Buyer are sometimes referred to individually as a "Party" and collectively as the "Parties".

RECITALS:

WHEREAS, Seller is in the business of producing, procuring and selling Coal (as defined below) and Buyer purchases Coal in the course of their ordinary business;

WHEREAS, Buyer and Seller desire to enter into a transaction for the purchase and sale of Coal pursuant to the terms of this Agreement;

WITNESSETH:

NOW THEREFORE, in consideration of the mutual agreements contained herein, and for other good and valuable consideration, and intending to be legally bound, the receipt and sufficiency of which is hereby acknowledged by the Parties; Buyer and Seller agree as follows:

ARTICLE 1
DEFINITIONS

1.1 Definitions.
When used in this Agreement the following capitalized terms shall have the meanings set forth as follows:

(a) "ASTM Standards" shall mean the standards of ASTM International as set out in its Annual Book of Standards from time to time.

(b) "Coal" shall mean the coal supplied under this Agreement.

(c) "Coal Inventory" shall mean coal located in the Stockpile Area, supplied by Seller

(d) "Coal Price" shall mean the price of the Coal, FOB Stockpile Area

(e) "Contract Year" shall have the meaning set forth in Article 2.1.

(f) "Delivered Price" shall have the meaning as set forth in Article 5.

(g) "Dollars", whether expressed in words or symbols, shall mean U.S. Dollars.

(h) "Effective Date" shall mean May 1, 2016.

**EXHIBIT 1**

(i) "Environmental Fee" shall have the meaning set forth in Article 5.4.

(j) "Liabilities" shall mean any and all liabilities, claims, obligations, damages, causes of action, penalties, fines, violations, costs and expenses (including, but not limited to, court costs and attorneys' fees).

(k) "Loading Fee" shall have the meaning set forth in Article 4.2.

(l) "Loading Point" shall mean the Bent Mountain Operation located near Meta, Pike County, Kentucky.

(m) "Rejection Limit" shall mean the limit identified as such on Exhibit 1.

(n) "Stockpile Area" shall mean those areas at the Loading Point that are designated by Buyer where coal is stockpiled for storage and handling prior to being loaded into trucks or railcars.

(o) "Storage Fee" shall have the meaning set forth in Article 5.3.

(p) "Term" shall have the meaning set forth in Article 2.1.

(q) "Ton" or "Tons" shall mean 2,000 pounds avoirdupois on an "as received" basis.

## ARTICLE 2
## TERM

2.1 Term.
The term of this Agreement shall commence on the Effective Date and shall terminate on the earlier of; (a) when all of the Coal has been removed from the Stockpile Area by Buyer or (b) December 31st 2019 unless earlier terminated as set forth in this Agreement (the "Term"). When used in this Agreement, "Contract Year" shall mean the twelve-month period beginning each May 1st and ending on April 30th of the succeeding year.

## ARTICLE 3
## QUANTITY

3.1 Purchase and Sale of Coal.
Subject to the terms hereof Seller shall supply to Buyer, and Buyer shall purchase from Seller, Coal meeting the quality specifications and quantities set forth herein. The Parties agree that the tons contracted shall not change except by the mutual agreement of the Parties.

3.2 Quantity.
The quantity of coal to be delivered by Seller and purchased by Buyer during the Term of this Agreement is 750,000 tons (the "Total Quantity).

## ARTICLE 4
## DELIVERY AND COAL HANDLING

4.1  Delivery.

The quantity of Coal as described in Article 3 shall be delivered ratably to the extent possible and the Parties shall cooperate in good faith to establish a delivery schedule that shall reasonably accommodate the delivery schedule. The Parties contemplate the Total Quantity will be delivered to the Stockpile Area on or before December 31, 2016 but in no event later than the end of Contract Year One.

4.2  Scheduling.

Buyer shall advise Seller in writing on or before Wednesday of the preceding week of the estimated coal trucks or trains available for loading for each week during the Term. Seller shall cause the Coal sold hereunder to be properly loaded into the trucks or railcars for delivery (the "Loading Point"). Buyer shall be responsible for the locating and paying for the transportation costs associated with the truck or rail deliveries. For each ton of Coal loaded into a truck or train, Buyer shall pay Seller a Loading Fee of $2.35 per ton. The Loading Fee shall be calculated according to outgoing scale weights at the Loading Point if loaded in a truck and in accordance with the rail weights if loaded into a train. The Loading Fee shall be invoiced on a weekly basis in the same manner as the Purchase Price as set forth in Article 6.

4.3  Title.

Title to Coal supplied under this Agreement shall at all times remain with Seller until the Purchase Price is paid by Buyer. Once the Purchase Price is paid, title will pass on to Buyer notwithstanding coal that remains in the Stockpile Area. Under no circumstances shall any of the Coal supplied under this Agreement be commingled with any other coal in the Stockpile Area. Payment for coal to be removed from the Stockpile Area will be made to Seller in accordance with Article 6. In the event Buyer fails to take title to any of the coal delivered to the Stockpile Area, Buyer shall be responsible for any delivery costs reasonably incurred to return the coal to Seller or to any alternate location reasonably designated by Seller.

4.4  Access.

Buyer shall be granted permission to store Coal in the Stockpile Area and shall have access to the Stockpile Area during normal business hours. This right of access shall survive the termination of this Agreement and until such time as Buyer has removed the Coal from the stockpile area.

## ARTICLE 5
## DELIVERED PRICE

5.1  Delivered Price.

Delivered Price means; (i) the applicable Coal Price, plus (ii) the Storage Fee, plus (iii) the Environmental Fee.

5.2  Coal Price.

The price for the tons of coal shall be $35.75 per net ton FOB Stockpile Area.

5.3     Storage Fee.

Buyer shall be charged an annual Storage Fee of $2.60 per Ton. The Storage Fee shall be due and payable when the Coal is delivered into the Stockpile Area and will be invoiced by Seller in the same manner as the Coal Price in accordance with Article 6. If the Coal, or any portion thereof, has not been removed prior to the end of Contract Year One, then at the beginning of each Contract Year thereafter Buyer shall pay Seller the annual Storage Fee equal to those Tons that remain in inventory at the Stockpile Area. If, at any time after the conclusion of Contract Year One, the Coal is removed prior to the end of the Contract Year the Storage Fee will be refunded on a pro-rata basis against the Loading Fee for those Tons. For example, if in Contract Year Two Coal is removed from the Stockpile Area in the fifth month of the Contract Year, then 7/12ths of the Storage Fee for those tons removed will credited against the Loading Fee for those Tons.

5.4     Environmental Fee.

Buyer shall be charged an Environmental Fee of $1.65 per Ton. The Environmental Fee shall be due and payable when the Coal is delivered into the Stockpile Area and will be invoiced by Seller in the same manner as the Coal Price in accordance with Article 6.

## ARTICLE 6
## INVOICING AND PAYMENT

6.1     Invoicing.

Seller shall submit invoices to Buyer each Monday during the term of this Agreement based on Seller's weighted average data for all coal shipped from Monday through Sunday of the prior week. Buyer will pay to Seller the invoice amount on or before Friday of the week the invoice is tendered, provided Seller's invoice is submitted in compliance with the preceding two sentences. Buyer shall not be obligated to make payment to Seller for Shipments of Coal until the analytical results have been provided to Buyer.

Payment shall be made by wire transfer or electronic means in immediately available United States funds for all coal received, taken into account, and accepted hereunder. If not already provided in this Agreement, Seller shall provide Buyer all pertinent remittance instructions in a letter (containing the bank name, account name, ABA number, and account number, as well as Seller's federal tax identification number) which shall be signed by a duly authorized representative of Seller. Any change in the remittance instructions shall be provided in the same manner. Overdue payments shall accrue interest (the prime rate of interest for United States Dollars as published from time to time during such period under the section titled, "Money Rates" by *The Wall Street Journal*, plus two percent per annum but not to exceed the maximum applicable lawful interest rate (hereinafter "Interest Rate") from the due date until paid.

If any Party in good faith reasonably disputes an invoice, it shall provide a written explanation specifying in detail the basis for the dispute and pay any undisputed portion no later than the due

date. Upon resolution of any dispute involving an invoice, any additional amount owing shall be paid with interest at the Interest Rate. If any Party fails to pay amounts under this Agreement when due, unless such amount is the subject of a dispute as provided above, or is excused by Force Majeure, in addition to the rights and remedies provided in this Agreement, the aggrieved party shall have the right to suspend performance under this Agreement until such amounts (plus interest if applicable) have been paid, and/or exercise any remedy available at law or in equity to enforce payment of such amount due (plus interest if applicable) at the Interest Rate defined herein.

## ARTICLE 7
## WEIGHING

7.1 Weighing.
(a) The weights of the Coal delivered hereunder shall be determined by Seller by use of a scale system located at the Loading Point. As to deliveries, when no Loading Point scale weights are available, then weights shall be taken at the ultimate destination by Buyer.

(b) Weights taken in accordance with this Article 7 shall be deemed accepted as correct (absent manifest error) and shall govern all invoicing and payments hereunder. Unless otherwise specified, the costs of weighing shall be for Seller's account.

## ARTICLE 8
## SAMPLING AND TESTING

8.1 Sampling and Testing.
(a) Coal shall be sampled at the Loading Point (being loaded into the Stockpile Area) on a daily basis in such amounts as are usual and customary in the industry. Such sampling and analysis will be performed in accordance with ASTM Standards by an independent laboratory with the cost thereof for Seller's account. However, if Buyer requests a sample, one shall be provided by the independent laboratory. The quality of the Coal for purposes of determining premiums, penalties and rejection shall be governed by the sample and analysis performed by an independent lab and will be determined by calculating the weighted average of the composite of the truckloads that are unloaded into the Stockpile Area during a given week (Monday through Sunday).

## ARTICLE 9
## QUALITY, REJECTION AND SUSPENSION RIGHTS

9.1 Quality.
Quality of Coal supplied shall conform to the specifications as described in Exhibit A.

9.2 Rejection.
If any Shipment of Coal fails to conform to any requirement specified herein (a "Non-Conforming Shipment"), Buyer shall have the option, exercisable by notice to Seller of either (i) rejecting such Non-Conforming Shipment at the Loading Point, or (ii) accepting any Non-Conforming Shipment with a Contract Price adjustment agreed to between Seller and Buyer. Should Buyer exercise such

right of rejection, it shall notify Seller by e-mail or verbally upon discovery of the nonconformance, any verbal notification to be promptly confirmed in writing. If Buyer fails to exercise its rejection rights hereunder as to a Non-Conforming Shipment, Buyer shall be deemed to have waived such rights with respect to that Non-Conforming Shipment only. Non-Confirming tons shall not be placed in the Stockpile Area. If Buyer rejects the Non-Conforming Shipment, Seller shall be responsible for promptly transporting the rejected Coal to an alternative destination reasonably determined by Seller. Seller shall, at Buyer's request, replace the rejected Coal as soon as possible, provided that Buyer gives written notice to Seller of Buyer's desire for replacement Coal within thirty (30) days after rejection of the Non-Conforming Shipment.

## ARTICLE 10
## ASSIGNMENT

10.1   Assignment.

Neither Party shall, without the prior written consent of the other Party (such an approval shall not be unreasonably withheld, conditioned or delayed), assign this Agreement , except by merger or sale of substantially all the assets of the Parties, and any attempted assignment or delegation which is not permitted under this Article 10 shall be null and void. The rights, benefits, duties and obligations of each Party hereto shall inure to the benefit of, and be binding upon, the Parties hereto and their respective permitted successors, assigns or delegates.

## ARTICLE 11
## MISCELLANEOUS

11.1   Force Majeure.

If because of Force Majeure either Party is unable to carry out any of its obligations hereunder, and if such Party shall promptly give notice thereof to the other Party, then the obligations of the Party giving such notice shall be excused to the extent made necessary by such Force Majeure and during its continuance, provided, however, that the Party giving such notice shall use commercially reasonable efforts to eliminate such Force Majeure. Any deficiencies in deliveries caused by Force Majeure shall be made up only if Buyer and Seller agree to do so, in which case the Parties will schedule any such make-up deliveries by mutual agreement.

The term "Force Majeure" shall mean any event or condition (i) that is beyond the reasonable control of the Party affected, and (ii) that such Party is unable to prevent or provide against by the exercise of reasonable diligence. Examples of such events and conditions include, but are not limited to: acts of God or of the public enemy; insurrection or riots; strikes, lockouts or other differences with workmen; fire; storm; flood; explosion; nuclear disaster; shortage of utility; embargo; order of civil or military authority; compliance with or other action taken to carry out the intent or purpose of any law or regulation; shortage of transportation equipment or other interruption in transportation; breakdown of equipment; adverse geological conditions; and any other cause, whether of the kind specifically enumerated above or otherwise. Force Majeure shall not be based on (i) lack of finances or Buyer's inability economically to use or resell the Coal to be purchased hereunder; (ii) Seller's inability to economically produce or otherwise procure the Coal to be sold hereunder; or (iii) a change in market conditions, including the ability of Seller to sell Coal at a higher price or Buyer to buy coal or other fuels at a lower price, whether or not foreseeable. It is understood and agreed that settlement of strikes, lockouts and other labor disputes

shall be entirely within the discretion of the Party declaring Force Majeure and shall not require the settlement of strikes, lockouts and labor disputes when such course is inadvisable in the discretion of such Party.

11.2   Waiver.
The failure of Seller to Buyer to insist in any one or more instances upon strict performance of any of the provisions of this Agreement or to take advantage of any of its rights hereunder shall not be construed as a future waiver of any such provisions or the relinquishment of any such rights, but the same shall continue and remain in full force and effect for the term of this Agreement.

11.3   Events of Default. Remedies.  An event of default (Event of Default" under this Agreement shall be deemed to exist upon the occurrence of any one or more of the following events: (a) failure by either Party to make payment of any amounts due the other Party under this Agreement if such failure continues for a period of 5 days after written notice by the other Party of such non-payment, or (b) failure by either Party to perform any other obligation imposed by this Agreement if such failure continues for a period of thirty (30) days after notice by the other Party of such failure.

In addition to any other rights or remedies provided for in this Agreement, upon the occurrence of an Event of Default, the Party not in default shall have the right to terminate this Agreement upon providing the other Party not less than ten (10) days written notice.


11.4   Effect of Termination.
Upon and after expiration or termination of this Agreement pursuant to this Article 11.4; (a) Buyer and Seller shall each remain obligated to make any payments due the other Party hereunder that accrued prior to the effective date of expiration or termination; and (b) Liabilities of either Party to the other arising from any act, Event of Default or occurrence prior to the effective date of termination shall remain with such Party.

11.5   Governing Law.
This Agreement shall be construed, enforced, and performed in accordance with the internal laws of the Commonwealth of West Virginia, without reference to principles of conflicts of law.  Each Party waives its respective right to any jury trial with respect to any litigation arising under or in connection with this Agreement.

11.6   Notices.
Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed sufficiently given on the date received if delivered by any reasonable means including, but not limited to, personal delivery, acknowledged telecopy, overnight delivery service that provides proof of receipt, or by registered mail (return receipt requested) postage prepaid, addressed as follows:

If to SELLER:

| | |
|---|---|
| Attn: | James C. Justice, III |
| Email: | jcj3@bluestoneindustries.com |
| Phone: | 540-776-7890 |
| FAX: | 540-301-5527 |

If to Buyer:

| | |
|---|---|
| Attention: | Monongahela Power Company |
| | 341 White Pond Drive |
| | Akron, Ohio 44320 |
| | Attention: James G. Mellody, Vice President, Fuel and Unit Dispatch |
| Email: | mellodyj@firstenergycorp.com |
| Telephone: | (330) 315-7421 |
| | and to |
| Attention: | FirstEnergy Service Company |
| | 76 South Main Street |
| | Akron, Ohio 44308 |
| | Attention: Vice President and General Counsel |
| Email: | rreffner@firstenergycorp.com |
| Telephone: | (330) 761-7896 |

11.8 Warranty.

Seller represents and warrants to buyer that it has title to all coal sold hereunder and the same is shipped free and clear of all liens, encumbrances, and claims of all third parties prior to transfer at the Loading Point. NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INCIDENTAL OR CONSEQUENTIAL LOSSES, DAMAGES OR EXPENSES DIRECTLY OR INDIRECTLY ARISING FROM THE SALE, HANDLING OR USE OF THE COAL SUPPLIED HEREUNDER, OR FROM ANY OTHER CAUSE RELATING THERETO. OTHER THAN THE COAL SPECIFICATIONS, SELLER MAKES NO WARRANTY EXPRESS OR IMPLIED AS TO THE QUALITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE COAL TO BE SUPPLIED BY SELLER OR AS TO THE RESULTS TO BE OBTAINED BY THE USE OF SUCH COAL.

12.1  Right to Resell.

Buyer, in its sole and absolute discretion, shall have the right, but not the obligation to resell any or all the Coal purchased hereunder.

IN WITNESS WHEREOF, the Parties by their respective duly authorized representatives have executed this Agreement as of the Effective Date.

BLUESTONE ENERGY SALES CORPORATION

By: _____

Its: ____Executive Vice President____

Date: ____May 23, 2016____

MONONGAHELA POWER COMPANY

By: _____

Its: ____Assistant Controller____

Date: ____May 16, 2016____

KAP RCG Dot. JSM

## Exhibit 1

| Characteristic | Typical | Maximum/Minimum |
|---|---|---|
| Btu/lb | 12,000 | 11,700 |
| Ash (%) | 12.8 | 14.0 |
| Sulfur | .92 | 1.0 |
| Moisture | 6.7 | 8.5 |

Premiums and Penalties. For each 100 Btu's above or below 12,000 a premium or penalty shall be applied to the Purchase Price equal to $0.333 per 100 Btu's.