UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>PLEASANTS CORP., *et al.*,[1]<br><br>              Debtors,<br><br>―――――――――――――――――<br><br>FIRSTENERGY SOLUTIONS CORP.,<br><br>              Plaintiff,<br><br>    v.<br><br>BLUESTONE ENERGY SALES CORP.<br><br>             Defendant. | Chapter 11<br><br>Case No. 18-50763 (AMK)<br>Cases Jointly Administered under<br>Case No. 18-50757 (AMK)<br><br>Hon. Judge Alan M. Koschik<br><br>Adversary No. 18-05100-AMK |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Energy Harbor Generation LLC (0561), case no. 18-50762; Pleasants Corp. (5914), case no. 18-50763; Energy Harbor Nuclear Generation LLC (6394), case no. 18-50760; Energy Harbor Nuclear Corp. (1483), case no. 18-50761; and Energy Harbor LLC (0186), case no. 18-50757. The Debtors' address is: 168 E. Market Street, Akron, OH 44308.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ...........................................................................................................................2

    A.    **Bluestone Purchases 130,771 Tons of Coal from FES**..........................................2

    B.    **Bluestone Makes Partial Payment to FES and Affirms the Parties' Mutual Understanding of the Agreement** ...............................................................4

    C.    **Bluestone Fails to Make Full Payment and the Purchased Tons Disappear** ..................................................................................................................6

ARGUMENT .................................................................................................................................7

    A.    **Legal Standard** ........................................................................................................7

    B.    **Summary Judgment Should Be Granted**............................................................9

        1.    **Most Facts Are Undisputed** .......................................................................9

        2.    **The Terms of the Agreement Are Clear and Unambiguous** ................10

        3.    **The Unambiguous Terms of the Agreement Are Supported by the Discovery Record** .............................................................................12

CONCLUSION............................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Averill v. Gleaner Life Ins. Soc'y*,
    626 F. Supp. 2d 756 (N.D. Ohio 2009) ................................................................... 9

*Carpenter v. Liberty Ins. Corp.*,
    No. 3:17-CV-228, 2019 WL 4574477 (S.D. Ohio Sept. 20, 2019) ........................... 8

*Chevron U.S.A., Inc. v. Bonar*,
    No. 16-1213, 2018 WL 871567 (W. Va. Feb. 14, 2018) ......................................... 12

*Clark v. W & M Kraft, Inc.*,
    No. 1:05-CV-00725, 2013 WL 3224034 (S.D. Ohio June 25, 2013) ...................... 10

*Edwin Miller Investments, L.L.C. v. CGP Dev. Co., Inc.*,
    752 S.E.2d 901 (W. Va. 2013) ................................................................................ 11

*In re Hard Rock Exploration, Inc.*,
    580 B.R. 202 (Bankr. S.D.W. Va. 2017) ................................................................... 9

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*,
    190 F.3d 768 (6th Cir. 1999) .................................................................................... 9

*Kellogg Co. v. Sabhlok*,
    471 F.3d 629 (6th Cir. 2006) .................................................................................. 12

*In re Kids World of Am., Inc.*,
    349 B.R. 152 (Bankr. W.D. Ky. 2006) ...................................................................... 7

*Lincoln Elec. Co. v. St. Paul Fire and Marine Ins. Co.*,
    210 F.3d 672 (6th Cir. 2000) .................................................................................. 14

*Silver Line Bldg. Prods., Corp. v. Mach. Design Concepts, Inc.*,
    No. 5:04-CV-190, 2005 WL 2009054 (N.D. Ohio Jan. 28, 2005) ............................ 8

*United States v. Ward*,
    377 F.3d 671 (7th Cir. 2004) .................................................................................. 14

*Vona Investments Ltd. v. Hmi Indus., Inc.*,
    No. 1:13-CV-01887, 2014 WL 12546665 (N.D. Ohio Oct. 21, 2014) ...................... 8

**Statutes**

11 U.S.C. § 542 ................................................................................................................. 7

**Other Authorities**

Fed. R. Bankr. P. 7056................................................................................................................7

Fed. R. Civ. P. 56......................................................................................................................7

iii

# PRELIMINARY STATEMENT

Plaintiff FirstEnergy Solutions Corp. ("FES")[2] moves for summary judgment against defendant Bluestone Energy Sales Corporation ("Bluestone" or "BESC") to recover the $2,960,073.38 that Bluestone owes FES pursuant to the plain terms of an unambiguous contract. In October 2016, FES entered into a Coal Purchase Agreement (the "Agreement") with Bluestone, whereby Bluestone purchased 130,771 tons of coal from FES at $40 per ton, for a total price of $5,230,840. Bluestone is a coal producer and had previously sold the same 130,771 tons of coal to FES under an earlier agreement. Due to this prior course of dealing, the purchased coal was located in a stockpile on Bluestone's property at all times relevant to this dispute.[3]

FES made two notable concessions to Bluestone under the Agreement. First, FES agreed to pay Bluestone a start-up fee of $8 per ton at execution, or $1,046,168 total. Second, FES did not require upfront payment and instead provided a window for Bluestone to make partial payments as it resold the coal to third parties. However, Bluestone was required to pay any outstanding amounts due as of February 28, 2017 by no later than March 7, 2017.

Most of the facts in this case are not in dispute. Bluestone admits that the Agreement was valid and enforceable and that FES fully performed under it, including by making the prompt payment of the roughly $1 million start-up fee to Bluestone. Bluestone further admits the partial amounts paid to FES to date ($2,270,766.62) and that further money is owed to FES under the Agreement. In other words, Bluestone admits that it is in breach.

The only matter left for the Court to decide is how much additional money Bluestone owes FES under the Agreement. On this point, the Agreement is clear and unambiguous—

---
[2] Following the Debtors' emergence from bankruptcy, FES was renamed Energy Harbor LLC.
[3] For reasons not relevant to this motion, FES did not use the coal from Bluestone, and therefore the coal remained with Bluestone.

1

Bluestone agreed to purchase 130,771 tons of coal at a price of $40 per ton, for a total price of $5,230,840. Thus, the amount owed by Bluestone is the difference between the total amount owed ($5,230,840) and the amount paid by Bluestone to date ($2,270,766.62)—***$2,960,073.38.*** Finally, even if the terms of the Agreement were ambiguous (and they are not), document discovery has shown that both parties understood and intended that Bluestone would pay the full $5,230,840 owed under the Agreement.

Accordingly, the Court should grant summary judgment in FES's favor on all counts.

## BACKGROUND

### A. Bluestone Purchases 130,771 Tons of Coal from FES

On October 10, 2016, FES and Bluestone entered into the Agreement, under which Bluestone purchased 130,771 tons of coal from FES (defined in the Agreement as the "Purchased Tons") at a price of $40 per ton.[4] (Agreement, attached as **Exhibit A** to the *Declaration of Ken Peace in Support of Plaintiff's Motion for Summary Judgment* filed contemporaneously herewith ("Peace Decl."); *see also Defendant's Responses to Plaintiff's First Set of Requests For Admissions*, attached as **Exhibit 1** to the *Declaration of Christopher J. Gessner in Support of Plaintiff's Motion for Summary Judgment* filed contemporaneously herewith ("Gessner Decl.").) In other words, Bluestone agreed to buy the Purchased Tons for $5,230,840 (130,771 tons at $40 per ton).

Due to a prior agreement between Bluestone and an affiliate of FES, the Purchased Tons were not in FES's possession at the time of the sale. Instead, the Purchased Tons were located in a stockpile on Bluestone's property (the "Stockpile"), at the Bent Mountain Operation near Meta, Kentucky. (Agreement, Recitals.)

---

[4] The Agreement is governed by West Virginia law. (Agreement § 8.)

Instead of requiring Bluestone to pay for the Purchased Tons upfront, FES agreed that Bluestone could make payments as it sold the coal in the Stockpile to third parties.[5] (Agreement § 2; *Memorandum in Support of Defendant's Motion to Dismiss Count I of the Adversary Complaint* [Docket No. 7-1], at 4.) However, if any of the Purchased Tons remained in the Stockpile as of February 28, 2017, the Agreement provides that "BESC shall pay FES for all such remaining Purchased Tons no later than March 7, 201[7]." (Agreement § 2.)

FES also agreed to pay Bluestone "$8.00 per ton for the Purchased Tons for a total sum of One Million Forty Six Thousand One Hundred Sixty Eight Dollars ($1,046,168)."[6] (Agreement § 7.) The Agreement contemplates such payment in recognition of certain "activation and start-up expenses incurred by BESC . . ." (Agreement, Recitals.) Thus, FES agreed to pay Bluestone $8.00 for each of the Purchased Tons for a total payment of $1,046.168. (Peace Decl., **Exs. A, B & C**.)

No provision of the Agreement allows Bluestone to purchase or make payment for anything less than 130,771 tons of coal at $40 per ton. The Purchased Tons, as defined in the Agreement, refer to the "130,771 tons of coal that was delivered into [the Stockpile]." (Agreement, Recitals.) The parties agreed that "[t]he price for the Purchased Tons shall be $40 per ton," and that the "Purchased Tons are being purchased on an As-Is Where-Is basis and FES makes no representations or warranties as to the quality of the Purchased Tons." (Agreement § 4.)

These strict payment terms were necessary because the Purchased Tons were located in the Stockpile on Bluestone's property. Accordingly, FES could not—and did not—bear the risk

---

[5] Under Section 5 of the Agreement, Bluestone was required to "submit invoices to FES each Monday during the term of [the] Agreement based on [Bluestone's] weighted average data for all coal shipped from Monday through Sunday of the prior week," and Bluestone was to pay FES "the invoice amount on or before Friday of the week the invoice is tendered." (Agreement § 5.)

[6] (130,771 tons) * ($8/ton) = $1,046.168

of any loss of coal.  Indeed, absent these terms, Bluestone—having already received over $1 million from FES—would have an incentive to lose or neglect the Purchased Tons in an attempt to reduce the amount owed.

> **B.    Bluestone Makes Partial Payment to FES and Affirms the Parties' Mutual Understanding of the Agreement**

Shortly after the parties executed the Agreement, FES paid Bluestone the start-up fee of $1,046,168 for the Purchased Tons as contemplated by the Agreement.  (Peace Decl., **Exs. C & D**.)  In turn, FES began to receive checks from Bluestone purportedly related to sales of the Purchased Tons in the Stockpile.  (Peace Decl., **Ex. G**; *Declaration of Kim R. Pompeo in Support of Plaintiff's Motion for Summary Judgment* ("Pompeo Decl.") filed contemporaneously herewith, **Ex.A**.)  Although the Agreement required Bluestone to submit invoices showing weights or tonnage information for the coal purportedly removed from the Stockpile, Bluestone failed to do so.  (Agreement § 5.)  FES requested that Bluestone comply with the contract and provide invoices and tonnage information multiple times, but Bluestone ignored each of FES's requests.  (*See* Peace Decl, **Ex. E**.)  Although FES received numerous checks from Bluestone, to date, the only invoice FES received from Bluestone regarding the Agreement was an invoice seeking payment *from FES* for the start-up fee.  (Peace Decl., **Ex. B**.)

As the deadline for Bluestone to make full payment neared, certain FES employees exchanged emails expressing concern that Bluestone had only paid a small portion of the total purchase price.  On February 9, 2017, FES employee Ann Marie Parker emailed Ken Peace, a Fuel Procurement Consultant at FES, that Bluestone had "only loaded 1700 tons out of the Bent Mountain pile so far this year."  (Peace Decl., **Ex. F**.)  Ken Peace replied that it was "[n]ot a big issue" because Bluestone would simply "pay us for the rest [of the coal] after end of Feb." (Peace Decl., **Ex. F**.)

All told, from October 10, 2016 to February 28, 2017, Bluestone paid FES a total of $2,148,443.29 for approximately 53,711.08 Purchased Tons. (Peace Decl., **Ex. G**; Pompeo Decl., **Ex. A**.) However, on February 28, 2017, Bluestone's window to make partial payments closed, and Bluestone was required to pay for the balance of the remaining Purchased Tons no later than March 7, 2017. (Agreement § 2.)

On March 2, 2017, five days before the full payment was due, FES received a letter from Bluestone (the "March 2, 2017 Letter") in which Bluestone provided an "update regarding the status of payment" to FES. (Peace Decl., **Ex. H**.) In the letter, Bluestone claimed that it had "a significant amount of coal in inventory that it [was] waiting to ship, which total[ed] approximately 77,059.94 [tons]." (*Id.*) Bluestone further stated its "intention to have all of this coal delivered to customers by 4-15-17" and that "[o]nce this coal is shipped, [Bluestone] will be able to send payment to [FES]." (*Id.*)

Bluestone's admission in the March 2, 2017 Letter that 77,059.94 tons "remained" reflects an understanding that Bluestone owed payment for all 130,771 Purchased Tons. As of February 28, 2017, Bluestone had paid FES $2,148,443.29. (*See* Peace Decl., **Ex. G**; Pompeo Decl., **Ex. A**.) At the contract price of $40 per ton, Bluestone's payments reflect the purchase of 53,711.08 tons.[7] The sum of 53,711.08 tons and the 77,059.94 tons that Bluestone admitted in its letter were "remaining," yields 130,771.02 tons—the total amount of the Purchased Tons to within two hundredths of a ton.[8] The March 2, 2017 Letter does not mention—and Bluestone's calculations do not reflect—a reduction in amounts owed due to deterioration of the coal or costs incurred in treating or moving the coal. (Peace Decl., **Ex. H**.)

---

[7] ($2,148,443.29) ÷ ($40/ton) = 53,711.08 tons.
[8] (53,711.08 tons) + (77,059.94 tons) = 130,771.02 tons

5

Despite its promise to make the rest of its payment by April 15, 2017, Bluestone failed to do so. On May 24, 2017, FES employee Ken Peace sent an email (the "May 24, 2017 Email") to James "Jay" Justice, the Chief Executive Officer of Bluestone, to "inquire about the status of the final payment." (Peace Decl., **Ex. I**.) Mr. Justice responded on June 2, 2017, stating that "lots of coal [is] still on [the] ground" and that he would "get money moving again very soon to [FES]." (*Id.*) In his email, Mr. Justice did not dispute FES's interpretation of the Agreement, the amount of coal that remained in the Stockpile, or the remaining amount owed to FES under the Agreement. (*Id.*) Indeed, Bluestone has never, prior to the initiation of this litigation, raised any dispute regarding the Agreement.

### C. Bluestone Fails to Make Full Payment and the Purchased Tons Disappear

Despite Mr. Justice's promise, FES never received the final payment. Instead, on August 4, 2017, FES received a payment of only $122,323.33, which accounted for roughly 3,058 additional tons of coal. (*See* Peace Decl., **Ex. G**.) On December 21, 2017, Mr. Peace emailed FES employee Anthony Sessi and asked him to "schedule a trip to Bent Mountain to confirm the pile of coal belonging to [FES] is still there and provide an estimate of the tonnage." (Peace Decl., **Ex. J**.) On January 4, 2018, Mr. Sessi emailed Mr. Peace with his findings from his visit to Bent Mountain. (*Id.*) He reported that when he arrived at the site, "no one was there," and that "the only thing that [he] could see left on the ground was the base of the coal pile." (*Id.*) Mr. Sessi confirmed his account with pictures that he attached to the email, which did not show any coal remaining in the Stockpile. (*Id.*) Mr. Peace then emailed Carolinn Mills at FES, confirming that "the coal at Bent Mountain is no longer in the stockpile area where we last identified it." (*Id.*)

To date, FES has received $2,270,766.62 from Bluestone, which accounts for 56,769.17 tons of coal. (*See* Peace Decl., **Ex. G**; Pompeo Decl., **Ex. A**.) Subtracting 56,769.17 from the 130,771 Purchased Tons, Bluestone still owes FES $2,960,073.20 for the remaining 74,001.83 tons of coal (the "Remaining Tons").

## ARGUMENT

The issue before the Court is whether Bluestone breached the Agreement and owes FES payment for the Remaining Tons. Based on the plain, unambiguous terms of the Agreement and the undisputed facts of the case, the answer is simple: there was a valid contract between the parties, whereby Bluestone promised to pay FES for each of the 130,771 Purchased Tons at a price of $40 per ton no later than March 7, 2017. FES fully performed under the contract, providing the coal to Bluestone and paying Bluestone the $1,046,168 start-up fee. In contrast, Bluestone breached the Agreement, never paying FES the full amount owed. The Agreement is unambiguous, and even if it were not, discovery has shown that there is no genuine issue of material fact regarding any of the foregoing. Accordingly, the Court should grant the Plaintiff's motion for summary judgment on all counts.[9]

**A. Legal Standard**

Rule 56 of the Federal Rules of Civil Procedure, as incorporated by Federal Rule of Bankruptcy Procedure 7056, provides that a party may move for summary judgment on part or all of its claims or defenses. Fed. R. Civ. P. 56. A moving party is entitled to summary judgment if the pleadings, the discovery, and any affidavits show that there is no genuine dispute to any

---

[9] Plaintiff's adversary complaint asserts claims for both breach of contract and turnover pursuant to 11 U.S.C. § 542(b). Although this motion focuses on the breach of contract claim, the Court also should grant summary judgment on the turnover claim. Even after document discovery, there remains no evidence that Bluestone disputed the amount owed to FES before this litigation began, nor does Bluestone dispute that the amount is matured and payable on demand. With no bona fide dispute regarding the amount owed, turnover is warranted. *See In re Kids World of Am., Inc.*, 349 B.R. 152, 163 (Bankr. W.D. Ky. 2006).

material fact and the movant is entitled to judgment as a matter of law. *Carpenter v. Liberty Ins. Corp.*, No. 3:17-CV-228, 2019 WL 4574477, at *2 (S.D. Ohio Sept. 20, 2019). Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations or denials of its pleadings, but must produce evidence that results in a conflict of material fact to be resolved by a jury." *Vona Investments Ltd. v. Hmi Indus., Inc.*, No. 1:13-CV-01887, 2014 WL 12546665, at *4 (N.D. Ohio Oct. 21, 2014). "The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be evidence on which the jury could reasonably find for the nonmoving party." *Id.*

When considering a motion for summary judgment, the inferences to be drawn from the underlying facts contained in the pleadings, discovery, and any affidavits must be viewed in the light most favorable to the nonmoving party. *Silver Line Bldg. Prods., Corp. v. Mach. Design Concepts, Inc.,* No. 5:04-CV-190, 2005 WL 2009054, at *1 (N.D. Ohio Jan. 28, 2005). The Court's favorable treatment of the facts and inferences, "however, does not relieve the nonmoving party of the responsibility 'to go beyond the pleadings' to oppose an otherwise properly supported motion for summary judgment." *Id.* Consequently, "[g]eneral averments or conclusory allegations of an affidavit" do not create fact disputes to defeat a motion for summary judgement—if the evidence relied on by the party opposing summary judgment is merely colorable or is not sufficiently probative, the court may proceed to decide the legal issue and grant summary judgment. *Id.* Overall, the "threshold inquiry" of determining whether there are any genuine factual issues that need to be resolved by a finder of fact depends on "whether the evidence presents sufficient disagreement" or "whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 2 (internal citations omitted).

In a contract dispute, a court may grant summary judgment when the language of the contract is unambiguous. *Averill v. Gleaner Life Ins. Soc'y*, 626 F. Supp. 2d 756, 761 (N.D. Ohio 2009) (citing *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999)). Under West Virginia law, contracts are interpreted as "a whole, taking and considering all the parts together, and giving effect to the intention of the parties wherever that is reasonably clear and free from doubt, unless to do so will violate some principle of law inconsistent therewith." *In re Hard Rock Exploration, Inc.*, 580 B.R. 202, 212 (Bankr. S.D.W. Va. 2017) (internal citations omitted). Courts are bound to the plain language of the contract in ascertaining the intent of the parties and cannot "alter, pervert, or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them." *Id.* (internal citations omitted).

### B. Summary Judgment Should Be Granted

#### 1. Most Facts Are Undisputed

There is no dispute that the Agreement is valid and enforceable, that FES fully performed its obligations under the contract, that Bluestone has paid some amounts owed to FES, and that Bluestone breached the contract:

<u>First</u>, Bluestone admits that the Agreement is a valid and enforceable contract. (*See* Gessner Decl., **Ex. 1**.)

<u>Second</u>, Bluestone admits that FES fully performed its obligations under the Agreement, including FES's initial payment of $1,046,168 to Bluestone. (*Id.*; Peace Decl., **Exs. B, C & D**.)

9

Third, Bluestone admits that it has paid FES $2,270,766.62 under the Agreement to date.[10] (Gessner Decl., **Ex. 1**.)

Finally, Bluestone has conceded on numerous occasions that it owes FES more money under the Agreement. At the May 3, 2019 Hearing on Bluestone's motion to dismiss, Bluestone stated that the dispute between the parties was merely "as to how many dollars are owed under [the Agreement]." (May 3, 2019 Hearing Tr. 17:1-17:11; 35:6-35:20). In the March 2, 2017 Letter, Bluestone provided "an update regarding the status of payment" to FES and stated its intention to "send payment to First Energy." (Peace Decl., **Ex. H**.) Similarly, Bluestone's CEO, James Justice, acknowledged in an email on June 2, 2017—months after the full payment was due—that there was "lots of coal" remaining in the Stockpile and that Bluestone would get "money moving" to FES. (Peace Decl., **Ex. I**.) Through these numerous admissions, Bluestone concedes that it is in breach of the Agreement and owes more money to FES.

### 2. The Terms of the Agreement Are Clear and Unambiguous

Summary judgment is appropriate "[w]hen a contract is clear and unambiguous" because "then its interpretation is a matter of law, and there is no issue of fact to be determined." *Clark v. W & M Kraft, Inc.*, No. 1:05-CV-00725, 2013 WL 3224034, at 3 (S.D. Ohio June 25, 2013). Here, the relevant terms of the Agreement are clear and unambiguous.

Read as a whole and in its plain terms, the Agreement is a straightforward coal purchase agreement between FES and Bluestone, whereby Bluestone agreed to "purchase from FES, the Purchased Tons." (Agreement § 1.) The Purchased Tons, as defined in the Agreement, refer to

---

[10] In response to FES's requests for admission, Bluestone admitted that it paid FES $2,270,766.62 "in association with the parties' agreements regarding the coal stockpile at issue" but puzzlingly refused to admit that such payments were specifically made "under the Coal Purchase Agreement." (Gessner Decl., **Ex. 1**.) To the extent such payments were not made under the Agreement, Bluestone would owe FES *even more* under the contract. However, for purposes of this motion, FES concedes that the $2,270,766.62 received from Bluestone was paid pursuant to the Agreement.

the "130,771 tons of coal that was delivered into [the] designated stockpile." (*Id.*, Recitals.) The Agreement states that "[i]f any Purchased Tons remain in the Stockpile as of February 28, 2017, then [Bluestone] shall pay FES for all such remaining Purchased Tons no later than March 7, 201[7]." (Agreement § 2.) The parties agreed "[t]he price for the Purchased Tons shall be $40 per ton," and that the "Purchased Tons are being purchased on an As-Is Where-Is basis and FES makes no representations or warranties as to the quality of the Purchased Tons." (Agreement § 4.)

The terms of the Agreement are clear and unambiguous: Bluestone contracted to pay FES for all 130,771 of the Purchased Tons by no later than March 7, 2017. Although the Agreement refers to the tons "remaining" in the Stockpile as of February 28, 2017, this does not mean that determining the final amount owed required anything other than a mathematical calculation on that date. The rest of the Agreement makes clear that "remaining" simply means the Purchased Tons not yet paid for—in other words, the difference between the total price of the Purchased Tons and the amount FES had been paid as of February 28, 2017. For example, the Agreement required payment to Bluestone of $8 per ton for each of the 130,771 Purchased Tons in consideration of "Activation and Start-Up Cost Mitigation" for a total payment of $1,046,168.[11] (Agreement § 7.) In turn, the Agreement provides that Bluestone shall pay FES for the same Purchased Tons at the price of $40 per ton. (Agreement §§ 1-4.) It defies logic that the Agreement would calculate FES's payment of start-up costs for the Purchased Tons to Bluestone in a mathematical manner—by multiplying the total Purchased Tons by the agreed upon $8 unit price—but require a ***different*** methodology to calculate Bluestone's subsequent payment to FES for the same Purchased Tons. *Edwin Miller Investments, L.L.C. v. CGP Dev.*

---

[11] (130,771 tons) * ($8/ton) = $1,046,168

*Co., Inc.*, 752 S.E.2d 901, 906-07 (W. Va. 2013) (a contract must be construed to "render all its provisions consistent and harmonious") (internal citations omitted).

Furthermore, it strains credulity that the parties, when entering into the Agreement, intended that Bluestone could avoid its payment obligations by claiming that the Purchased Tons disappeared or degraded through Bluestone's own neglect. Such an interpretation of the Agreement leads to an absurd result, whereby Bluestone could reduce the amount owed to FES by neglecting the Purchased Tons in the Stockpile. *See Kellogg Co. v. Sabhlok,* 471 F.3d 629, 636 (6th Cir. 2006) ("[C]ontracts must be construed consistent with common sense and in a manner that avoids absurd results); *Chevron U.S.A., Inc. v. Bonar*, No. 16-1213, 2018 WL 871567, at *3 (W. Va. Feb. 14, 2018) (rejecting interpretation of contract that would lead to an "unreasonable" result because generally courts "will not interpret a contract in a manner that creates an absurd result").

Thus, because Bluestone owed FES a total of $5,230,840 and Bluestone has paid $2,270,766.62 to date, the plain, unambiguous terms of the Agreement require Bluestone to pay FES the remaining $2,960,073.38.

### 3. The Unambiguous Terms of the Agreement Are Supported by the Discovery Record

Even if the terms of the Agreement were ambiguous (and they are not), the documents produced in discovery support FES's position and demonstrate that there are no genuine disputes of material fact. Neither party has produced any documents that contradict FES's interpretation of the Agreement or its account of the events. In fact, all of the communications produced by the parties reveal an understanding that is consistent with FES's interpretation of the Agreement.

Bluestone has not produced any internal communications reflecting its contemporaneous understanding of the Agreement. Thus, the only evidence of Bluestone's interpretation of the

12

Agreement are Bluestone's communications with FES. In each of those contemporaneous communications, Bluestone acknowledged (both explicitly and tacitly through its conduct) that it shared FES's understanding of the Agreement.

In the March 2, 2017 Letter, Bluestone admitted that as of that date it had "a significant amount of coal in [its] inventory that it [was] waiting to ship, which [was] approximately 77,059.94 tons," and promised payment would be remitted to FES once the coal was shipped. (Peace Decl., **Ex. H**.) Bluestone's admission that approximately 77,059.94 tons remained is telling, because that was the amount of tons remaining based on a purely mathematical calculation of the remaining coal. (*Id.*) As noted above, at the time of the March 2, 2017 Letter, Bluestone had paid $2,148,443.29 to FES, which at a price of $40 represented 53,711.08 tons of coal. (*See* Peace Decl., **Ex. G**; Pompeo Decl., **Ex. A**.) When that quantity (53,711.08 tons) is added to the tons remaining per Bluestone's letter (77,059.94 tons) the sum is 130,771.02 tons—the Purchased Tons by a rounding error of two-hundredths of a ton. Thus, Bluestone's own correspondence reflects an understanding that it was required to pay for all 130,771 Purchased Tons for a price of $5,230,840.

Mr. Peace and Mr. Justice's email exchanges on May 24, 2017 and June 7, 2017 are similarly damaging to Bluestone. In the May 24 email, Mr. Peace explains to Mr. Justice that the Agreement "ended in February" and stated that final payment for all remaining tons was to be made at that time, and that there was a "final payment of $3,084,741.16." (*See* Peace Decl., **Ex. I**.) Mr. Peace then asks Mr. Justice to notify him when FES can expect to receive payment from Bluestone. (*Id.*) In Mr. Justice's response on June 2, Mr. Justice does not dispute any of Mr. Peace's claims and instead explains that because there was "lots of coal still on ground," Bluestone would "get money moving again very soon to [FES]." (*Id.*) This email exchange

13

demonstrates that both Mr. Justice and Mr. Peace shared the understanding that under the Agreement, Bluestone owed FES for the remaining coal that had not yet been paid for. Furthermore, Mr. Justice's silence as to Mr. Peace's stated interpretation of the Agreement "reflect[s] the contracting parties' contemporaneous belief that the original contract terms are being honored" and "preclude[s] the existence of an ambiguity." *See Lincoln Elec. Co. v. St. Paul Fire and Marine Ins. Co.*, 210 F.3d 672, 687 n.16 (6th Cir. 2000); *see also United States v. Ward*, 377 F.3d 671, 675 (7th Cir. 2004).

FES's contemporaneous communications also reflect a consistent internal understanding of the Agreement. On February 9, 2017, Ms. Parker sent an email to Mr. Peace raising the concern that Bluestone had only loaded "1700 tons [of coal] out of the Bent Mountain pile so far" in 2017. (*See* Peace Decl., **Ex. F**.) Mr. Peace indicated that he was not alarmed because in any event, Bluestone would have to pay FES "for the rest [of the Purchased tons] after the end of Feb[ruary]." (*Id.*) Mr. Peace's response demonstrates his understanding that regardless of how much coal remained in the Stockpile, Bluestone was obligated to pay FES for the full amount owed for the Purchased Tons. Mr. Peace said that the amount of coal loaded from the Bent Mountain Stockpile is "[n]ot a big issue" precisely because he interpreted the Agreement to mean that Bluestone's payment obligations would not be affected by the issue raised by Ms. Parker. (*See id.*)

14

## CONCLUSION

FES sold Bluestone 130,771 tons of coal at $40 per ton, for a total price of $5,230,840. To date, FES has received $2,270,766.62 from Bluestone, which accounts for 56,769.17 Purchased Tons. Bluestone still owes FES $2,960,073.20 for the remaining 74,001.83 tons of coal. For the foregoing reasons, the Plaintiff's motion for summary judgment should be granted.

Dated: September 4, 2020

Respectfully submitted,

*/s/ Bridget A. Franklin*
**BROUSE MCDOWELL LPA**
Marc B. Merklin (0018195)
Bridget A. Franklin (0083987)
388 South Main Street, Suite 500
Akron, OH 44311-4407
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
mmerklin@brouse.com
bfranklin@brouse.com

 - and -

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Lisa G. Beckerman (admitted *pro hac vice*)
Joseph L. Sorkin (admitted *pro hac vice*)
Christopher J. Gessner (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
lbeckerman@akingump.com
jsorkin@akingump.com
cgessner@akingump.com

*Counsel for the Plaintiff*